# PECHMAN LAW GROUP PLLC
### ATTORNEYS AT LAW

**488 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**
**(212) 583-9500**
**WWW.PECHMANLAW.COM**

December 10, 2024

**VIA ECF**

Honorable Barbara C. Moses
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 740
New York, New York 10007

> Re: *Almonte v. JAM Maintenance, LLC et al.*,
> No. 22 Civ. 1820 (BCM) (*Cheeks* Joint Letter-Motion)

Dear Judge Moses:

We represent the Plaintiffs[1] in this Action. Together with the Building Defendants' attorney, David Binson of the Law Offices of David Binson, P.C., the Parties jointly submit this letter-motion to request approval of their Settlement as embodied in their Agreement (attached as Exhibit A to the Cuadra Declaration) and dismissal of this Action.

## FACTUAL AND PROCEDURAL HISTORY

Robert Kaszovitz is a principal of 1165 Gerard Realty LLC, 1170 Gerard Realty LLC, Beauty Realty LLC, Sagamore Realty LLC, and Prospect 2000 Realty LLC, five entities that own and operate five residential buildings (the "Buildings") in the Bronx, New York, while Akiva was involved in managing the Buildings. In approximately the middle of 2016, the Kaszovitzes and their limited liability companies (the "Building Defendants") retained Defendant Diego Ramirez and his company, JAM Maintenance LLC (together, the "JAM Defendants"), to perform building services and maintenance work at the five Buildings.

At different points between 2016 and the end of 2021, Plaintiffs worked as superintendents (*i.e.*, janitors), porters, and handymen at the Buildings. Plaintiffs Almonte, Cabrera, Lopez, Tirso Ramirez, and Perez worked as full-time live-in superintendents in different Buildings throughout their respective employment periods. Plaintiffs Heredia, Jimenez, Fiordaliza Ramirez, and Vasquez worked as porters or handymen. Plaintiff Marte typically worked as a superintendent, but he worked only as a porter at one point in his employment. Throughout their respective employment

---

[1] Unless otherwise stated, all capitalized terms used in this Letter-Motion are defined in the accompanying Declaration of Gianfranco J. Cuadra (the "Cuadra Decl.") and in the Agreement.

periods, the JAM Defendants hired and fired Plaintiffs, directly paid their wages per workweek, set their work scheduled, and directed their work duties.

On March 3, 2022, Plaintiffs, through their attorneys Pechman Law Group PLLC ("PLG"), commenced this Action against both the JAM Defendants and the Building Defendants (together, the "Action Defendants"). In the Complaint (ECF No. 1), Plaintiffs claimed that the JAM Defendants paid them on a weekly salary basis of $250 to $600. Plaintiffs further claimed that they worked between 68 and 70 hours per workweek, except for Plaintiff Perez, who claimed he worked approximately 49 hours per workweek. Plaintiffs claimed that these methods of payment failed to compensate them for minimum and overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA") and the New York Labor Law ("NYLL"). Plaintiffs further claimed the JAM Defendants failed to pay Plaintiffs who served as janitors (*i.e.*, superintendents) at the required per-unit rate under the NYLL and the New York State Minimum Wage Order for the Building Services Industry, 12 N.Y.C.R.R. Part 141 ("Part 141"). Finally, Plaintiffs alleged that the JAM Defendants failed to furnish them with required wage notices and wage statements in violation of the Wage Theft Prevention Act ("WTPA").

In their Complaint, Plaintiffs alleged that the Building Defendants were jointly and severally liable for the foregoing violations as joint employers. In particular, Plaintiffs claimed that the Kaszovitzes directly managed and directed Plaintiffs' work duties performed, had the authority to hire and fire Plaintiffs, changed some Plaintiffs' positions and work tasks, and could and did change the wages paid to Plaintiffs. For example, Plaintiffs alleged that Robert Kaszovitz denied Plaintiff Almonte's requests for raises in February and June 2018 and January 2019. ECF No. 1 ¶ 35. Plaintiffs further alleged that all Action Defendants were a joint "enterprise" for FLSA purposes and, together, had combined annual revenues in excess of $500,000. Id. ¶ 62.

The Action Defendants filed motions to dismiss and for summary judgment on November 21, 2022. ECF Nos. 46–54. In response, Plaintiffs filed a letter-motion arguing that Defendants' motions were premature, ignored controlling law, and in any event should be denied because Plaintiffs would file an amended complaint. ECF No. 57. Furthermore, Plaintiffs argued that any claims of defects in serving process on the Kaszovitzes should fail because the Kaszovitzes themselves caused delays in being served. *Id.* at 2. On a telephonic conference with District Judge J. Paul Oetken on December 2, 2022, the Court allowed Plaintiffs to file an Amended Complaint and stated that service on the Kaszovitzes that was late by only a few days was acceptable.

Plaintiffs filed their Amended Complaint realleging the Claims with additional specificity on December 12, 2022. ECF No. 60. On February 6, 2023, the Action Defendants renewed their motions to dismiss and for summary judgment. ECF Nos. 63–72. In sum, the Action Defendants argued that the Building Defendants were not joint employers, that the JAM Defendants did not alone meet the FLSA gross revenue threshold, and that the Kaszovitzes were not timely served. *See id.* Plaintiffs filed their opposition papers on March 31, 2023. ECF Nos. 77–78. In them, Plaintiffs alleged specific examples of the Kaszovitzes directing their work duties (ECF No. 77–2 ¶ 30–39), determining their roles and responsibilities (*id.* ¶ 21), and setting and handing their

wages (*id.* ¶¶ 23–24, 27). Plaintiffs claimed that Diego Ramirez admitted that the Building Defendants were the real "bosses" who set their pay (*id.* ¶¶ 20, 22, 25, 26, 28), and that both the JAM Defendants and Plaintiffs worked exclusively for the Building Defendants performing the same work duties in all Buildings (*id.* ¶¶ 19, 29). The Action Defendants filed reply papers in further support of their motions on June 2, 2023 (ECF Nos. 85–87). The Court denied the motions in their entirety on September 18, 2023. ECF No. 88.

The JAM Defendants filed an Answer on October 9, 2023. ECF No. 89. Although the Court entered an initial pretrial conference order on October 10, 2023 (ECF No. 92), the conference was adjourned and discovery stayed pending the Parties' anticipated mediation. *See* ECF Nos. 93–94. The Building Defendants filed their Answer on November 10, 2023. ECF No. 96. For several reasons, the mediation did not take place until March 5, 2024. *See* ECF Nos. 98, 101, 103. The mediation was unsuccessful, and Plaintiffs requested that the Court lift the stay on discovery over Defendants' objections. ECF Nos. 105–06, 108. Magistrate Judge Moses ordered all parties to submit a joint letter providing a status update and whether there would be a second mediation session. ECF No. 109. The parties submitted a joint letter on March 12, 2024 (ECF No. 110), after which the Court lifted the stay on discovery and scheduled an initial pretrial conference for April 24, 2024 (ECF No. 111). The parties submitted a joint pre-conference statement a week before the conference. ECF No. 115. Due to a scheduling conflict, the Court adjourned the initial conference to May 8, 2024. ECF No. 117.

At the initial conference, the parties agreed to attend a settlement conference before Judge Moses on July 2, 2024. ECF No. 120. The Court issued a case management order on May 8, 2024. ECF No. 121. The parties exchanged initial disclosures on May 22 and 23, 2024. Plaintiffs served document requests and interrogatories on all Action Defendants on May 28, 2024. The Action Defendants served document requests and interrogatories on Plaintiffs on June 20 and 21, 2024. Three days later, on June 25, 2024, the JAM Defendants' counsel requested leave to withdraw as counsel, citing a "complete breakdown in communications" with her clients. ECF No. 122. Earlier the same day, Plaintiffs had submitted their settlement position statement to the Court. The next day, Plaintiffs opposed the motion to withdraw for several reasons. ECF No. 125. The same day, the Court adjourned the settlement conference *sine die* and required the JAM Defendants' attorney to submit a revised motion to withdraw with supporting documents. ECF No. 124. The parties attended an in-person conference before Judge Moses on July 17, 2024 (ECF No. 132), at which the Court allowed the JAM Defendants' counsel to withdraw after filing additional documentation. *See* ECF Nos. 133–35.

By August, the remaining parties in the Action (*i.e.*, the "Parties," as defined in the Agreement) had a discovery dispute, which Plaintiffs brought to the Court's attention on September 6, 2024. ECF No. 136. The Court granted Plaintiffs' motion to compel discovery on September 13, 2024, and extended the discovery deadline to November 25, 2024. ECF No. 137. On September 20, 2024, the Building Defendants produced approximately 1,150 documents, including video, image, and audio files, concerning communications between the JAM and Building Defendants. To preserve resources before engaging in costly depositions, the Parties requested a settlement conference

before Judge Moses. ECF No. 138. The Court scheduled the conference for December 3, 2024, and extended the discovery deadline to January 14, 2025. ECF Nos. 139, 141.

The Parties submitted their settlement position statements to Judge Moses on November 26, 2024. On December 3, 2024, the Parties attended a settlement conference with Judge Moses from approximately 2:15 p.m. to 8:10 p.m. After hours of arm's length good faith negotiations before the Court, the Parties ultimately reached a settlement in principle. At the end of the settlement conference, the Parties stated their primary settlement terms on the Court's record. The individual Plaintiffs, through Rachel Henriquez serving as interpreter and counsel, confirmed on the record that they understood all of the primary settlement terms and agreed to be bound by them. The individual Kaszovitz defendants, both on behalf of themselves and the five corporate Building Defendants, likewise stated on the record that they understood and agreed to be bound to the primary settlement terms.

Pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015), the Parties jointly request that the Court approve their Settlement as a fair and reasonable resolution and dismiss the Action with prejudice but retain jurisdiction over it for purposes of enforcing the Agreement.

### THE PARTIES' DISPUTES, PLAINTIFFS' HIGHEST POSSIBLE DAMAGES, AND PLAINTIFFS' POTENTIAL RISKS

Plaintiffs claim that their highest potential recovery in this Action is $745,296.76, consisting of the following categories of damages:

| Category of Damages | Dollar Total |
|---|---|
| Unpaid Janitor Wages | $102,391.96 |
| Unpaid minimum and overtime wages | $166,018.58 |
| NYLL Liquidated Damages | $268,410.54 |
| NYLL Pre-Judgment Interest | $110,625.70[2] |
| WTPA Wage Notices (NYLL §§ 195, 198) | $97,850.00 |
| TOTAL | $745,296.76 |

Plaintiffs' calculation rests on two disputed facts: (a) Plaintiffs alleged hours worked per workweek; and (b) the Building Defendants' status as joint employers.

Plaintiffs claim that they worked on average 70 hours per workweek, except for Plaintiffs Fiordaliza Ramirez (68 hours per workweek) and Gabriel Perez (49 hours per workweek). Although the Building Defendants do not to know the exact hours that Plaintiffs worked per workweek, they argue that Plaintiffs worked far fewer hours. Plaintiffs respond that the Court must credit their recollection of hours worked in light of the lack of time records in this Action. *See, e.g., Jianhui Hu v. 226 Wild Ginger*, No. 17-cv-10161 (JGK), 2020 U.S. Dist. LEXIS 136524, at *4 (S.D.N.Y. July 31, 2020 ("[W]here the employer has failed to produce employment records to the court, the employee may

---

[2]     Prejudgment interest is calculated as of December 4, 2024, for purposes of this letter-motion.

establish his right to damages by recollection alone."); *Euceda v. Preesha Op. Corp.*, No. 14 Civ. 3143 (ADS)(SIL), 2016 U.S. Dist. LEXIS 91873, at *18 (E.D.N.Y. July 13, 2016) ("Where, as here, a defendant fails to rebut a plaintiff's assertions of hours worked and the rate of pay, the Court credits the plaintiff's recollection."). Defendants rebut that a jury would ultimately need to determine how many hours Plaintiffs truly worked per workweek.

If the case proceeds to trial, all non-janitor Plaintiffs risk a significant reduction in their potential recovery. If a jury determined that Plaintiffs worked only 35 hours per workweek on average, for example, no Plaintiff would have claims for unpaid overtime wages, and only Plaintiff Gabriel Perez, who received $250 per workweek, would have a minimal claim for unpaid minimum wages. If the jury determined that Plaintiffs worked on average 47 hours per workweek, for example, their total unpaid minimum and overtime wages would be reduced to approximately $70,000. For this reason, the four non-janitor Plaintiffs face great risk if the Action proceeds. The janitor Plaintiffs do not face this risk under Part 141, which entitles them to receive minimum per-unit rates regardless of how many hours they worked per workweek. *See* 12 N.Y.C.R.R. § 141–2.8. However, they, like all Plaintiffs, stand to lose all possible recovery if a jury finds that the Building Defendants were not Plaintiffs' joint employers.

The Building Defendants have denied, and continue to deny, that they employed Plaintiffs. The Parties respectfully refer the Court to their motion papers and the Court's decision for their respective positions on this disputed issue. *See* ECF Nos. 63–72, 77–78, 85–87, 88. Plaintiffs argue that the District Judge would not allow the Building Defendants to file another motion for summary judgment, and the Parties would instead need to proceed to trial. The Building Defendants disagree. Additional motion practice would be incredibly expensive to all Parties. Given the many disputed issues underlying the joint employment analysis, the Court would likely deny another motion and schedule a trial. A jury would have to assess on a plaintiff-by-plaintiff basis whether the Building Defendants jointly employed him or her. This would require a long and expensive trial. If a jury finds that the Building Defendants did not employ a Plaintiff, that Plaintiff would essentially recover $0. This is necessarily the case in this Action because the JAM Defendants are unreachable. Enforcing a judgment against them will be difficult. As such, the worst-case scenario for Plaintiffs is a recovery of $0.

Plaintiffs claim they are entitled to recover statutory damages under the WTPA because Defendants failed to furnish them with wage notices at the time of hiring and with accurate weekly wage statements. *See* N.Y. Lab. Law §§ 195(1), 195(3), 198(1–b), 198(1–d). Defendants argue that Plaintiffs lack Article III standing to pursue these claims. Plaintiffs respond that Defendants' violations of the WTPA were directly intertwined with their failure to pay Plaintiffs' wages due. ECF No. 60 ¶¶ 111–15, 144, 149. Had Defendants provided the required notices and statements, they would have paid Plaintiffs their wages due and informed them of the required per-unit and per-hour rates under New York law, thereby giving Plaintiffs the required information to challenge the wage payment violations alleged. *See id.* If the Court agrees with Defendants, the WTPA claims would be dismissed, but Plaintiffs would still be able to pursue them in state court.

## THE SETTLEMENT IS FAIR AND REASONABLE

Following summary judgment motion practice, an unsuccessful mediation, and a discovery dispute, the Parties attended a six-hour-long settlement conference. After lengthy arm's length negotiations, the Parties ultimately reached a settlement in principle only after the Court made a settlement proposal, which the Parties accepted and put on the record on December 3, 2024. The Parties agreed to settle the Action for $245,000, to be paid in four installments: $100,000 by December 31, 2024; $48,333.34 by January 31, 2025; and two payments of $48,333.33 by February 28 and March 31, 2025. Ex. A § 1(a). For the reasons that follow, the Court should approve the Parties' Settlement as embodied in the Agreement as fair and reasonable under *Cheeks* and the factors in *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012).

*First*, the Settlement is fair and reasonable considering Plaintiffs' potential range of recovery. Although Plaintiffs could recover more money if they were fully successful through all motions, trial, and appeals in this case, the Settlement Amount (*i.e.*, $245,000) represents approximately 91.3% of Plaintiffs' highest possible recovery for unpaid wages combined and approximately a third of their highest possible recovery. After deducting attorneys' fees and costs, Plaintiffs will share a fund of $162,163.25, equal to approximately 60.42% of their highest possible unpaid wages owed and approximately 21.76% of their highest possible damages claimed. Even after deducting fees and costs, Plaintiffs' recovery here fits comfortably within settlement ranges that courts "routinely" approve. *See, e.g.*, *Woods v. Fitzcon Constr./Ren Corp.*, No. 20 Civ. 8088 (ALC)(SLC), 2022 WL 17655576, at *3 (S.D.N.Y. Nov. 14, 2022) (approving settlement and noting courts accept settlement ranges of 9.4% to 26% of plaintiffs' highest estimated recovery); *Santos v. YMY Mgmt. Corp.*, No. 20 Civ. 1992 (JPC), 2021 WL 431451, at *1 (S.D.N.Y. Feb. 8, 2021) (approving settlement equal to 18% of plaintiff's highest damages and noting courts "routinely" accept settlements ranging from 12.5% to 20% of highest alleged recovery).

*Second*, the Parties settled the Action in large part to avoid costly litigation. The Parties have completed paper discovery. However, they have not yet conducted depositions, which will be extremely costly if the Action continues. The Parties would engage in motion practice after discovery, assuming no additional discovery disputes arise beforehand. Given the numerous disputed issues of fact in this Action, continuing with the Action would very likely result in a long jury trial, followed by potential appeals. Continuing with the Action could very well deplete most, if not all, of the Building Defendants' resources used to resolve it.

*Third*, there are significant risks to all Parties should the Action continue. Although Plaintiffs believe that they will ultimately succeed in this case, they recognize that Defendants raise defenses and allegations that, if accepted, could reduce or outright eliminate their damages. Attempting to enforce a judgment against the JAM Defendants would be difficult. In these circumstances, "[c]ase law recognizes that potential difficulty in collecting damages militates in favor of finding a settlement reasonable." *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013).

*Fourth*, the Settlement here is the product of arm's length negotiations between experienced counsel. *See* Cuadra Decl. ¶¶ 8–24. The Parties have been litigating this Action for over two years, during which time they have completed paper discovery, summary judgment motions, a discovery dispute, and attended a mediation and a settlement conference. It was not until after a day-long settlement conference that they ultimately agreed to settle this Action, and even so it was only because of the Court's settlement proposal that they reached a settlement. *See, e.g.*, *Woods*, 2022 WL 17655576, at *4 (approving settlement after "lengthy negotiations between the parties over the course of two years, including" two "settlement conferences" with the court). Against this backdrop, nothing here suggests fraud or collusion that would warrant rejecting the proposed Settlement.

*Finally*, the terms of the Agreement are consistent with *Cheeks* and its progeny. The release in the Agreement is limited to wage-and-hour claims. *See* Ex. A § 2(a). There are no confidentiality, non-disparagement, or no re-employment provisions in the Agreement. *See generally id.* To protect Plaintiffs against a potential default, the Building Defendants have executed confessions of judgment. *See* Ex. 1(e). To further protect Plaintiffs against a potential default, the Parties jointly request that the Court retain jurisdiction over this Action for purposes of enforcement. *See* Ex. A §§ 1(e)(i), 3(a).

## ATTORNEYS' FEES AND COSTS REQUESTED ARE REASONABLE

Pursuant to the retainer agreements between Plaintiffs and counsel, PLG's fees are 33.33% of the amount recovered after reimbursement of costs that PLG fronted to prosecute the Action. *See* Exs. B–C § 1; *In re Lawrence*, 24 N.Y.3d 320, 339 (2014) ("Absent incompetence, deception or overreaching, contingent fee agreements that are not void at the time of inception should be enforced as written."). PLG requests $81,081.63 in fees, equal to 33.33% of the Settlement Amount after reimbursement to PLG of $1,755.12 in costs that it incurred prosecuting the Action. Cuadra Decl. ¶¶ 25–31.[3]

"A contingency fee is presumptively valid where 'the proposed fee amount is exactly one-third of the net settlement amount.'" *See Angamarca v. Hud-Moe LLC*, No. 18-CV-1334 (RA), 2018 WL 6618412, at *1 (S.D.N.Y. Dec. 17, 2018) (quoting *Yunjian Lin v. Grand Sichuan 74 St Inc.*, No. 15-CV-2950 (RA), 2018 WL 3222519, at *5 (S.D.N.Y. July 2, 2018). Furthermore, "courts in this Circuit have routinely found an award representing one third of the settlement amount to be reasonable." *Yong Yuan Wang v. Mandarin Glen Cove, Inc.*, No. 18-CV-03266 (DLI) (CLP), 2019 WL 5695910, at *2 (E.D.N.Y. Sept. 30, 2019) (citing *Romero v. Westbury Jeep Chrysler Dodge, Inc.*, No. 15-cv-4145 (ADS) (SIL), 2016 WL 1369389, at *2 (E.D.N.Y. Apr. 6, 2016)); *see also Calle v. Elite Specialty Coatings Plus, Inc.*, No. 13-CV-6126 (NGG) (VMS)), 2014 WL 6621081, at *3 (E.D.N.Y. Nov. 21, 2014) ("A one-third contingency fee is a commonly accepted fee in this Circuit.") (collecting cases). A third of the settlement amount is "a percentage that courts in this district have generally deemed reasonable." *Woods*, 2022 WL 17655576, at *5.

---

[3] All invoices for costs incurred are attached as Exhibits C to the Cuadra Declaration. *See id.* ¶ 52.

Hon. Barbara C. Moses
December 10, 2024
Page 8 of 8

The fees of $81,081.63 requested here are lower than PLG's fees billed to date of $120,980.00 as reflected in PLG's contemporaneous billing records attached to the Cuadra Declaration as Exhibit D. *See* Cuadra Decl. ¶¶ 27–28. The lodestar (*i.e.*, almost 67%) is based on the hourly fees that PLG actually charges hourly-paying clients for work that its attorneys perform. *See id.* ¶¶ 27–31. The fees and costs requested are fair and reasonable as being less than the lodestar (*see id.* ¶ 31), as being consistent with the terms of Plaintiffs' retainer agreements with PLG (Exs. B § 1; *Chun Lan Guan v. Long Island Business Institute*, No. 15-CV-0225 (CBA)(VMS), 2020 WL 1289517, at *4 (E.D.N.Y. Mar. 18, 2020)), and as amounting to a fair and reasonable payment in light of the "considerable risk" that PLG undertakes by representing employees in wage-and-hour cases on a contingency fee basis. *See, e.g.*, *Sanchez v. JMP Ventures, L.L.C.*, No. 13 Civ. 7264 (GWG), 2015 WL 539506, at *6 (S.D.N.Y. Feb. 10, 2015); *see also* Exs. B. Furthermore, Plaintiffs accept the fees and all Distributions in the Agreement. See Ex. A §§ 5 (accepting Distribution to PLG as "consistent with the retainer agreements that Plaintiffs signed with PLG"), 8(b) (representing that all Plaintiffs reviewed all terms of Agreement in Spanish with their PLG attorneys fluent in Spanish and understand and agree to all of its terms, "including but not limited to the distribution of the Settlement Amount as fair and reasonable"); *see also* Cuadra Decl. ¶ 26. Accordingly, for these reasons and those set forth in the accompanying Cuadra Declaration (*see* Cuadra Decl. ¶¶ 8–31), PLG requests that the Court approve the attorneys' fee and costs requested as fair and reasonable.

The Parties thank the Court for its time and consideration of this matter and are available to address any additional questions from the Court if necessary.

Respectfully submitted,

Gianfranco J. Cuadra

cc: Building Defendants' Counsel (via ECF)

Enclosures